UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-cv-22338-ALTMAN/REID

TEMURBEK HIKMATULLAEV, *et al.*,

    Plaintiffs,

v.

MARCO ALESSANDRO VILLA, *et al.*,

    Defendants.
_____/

**REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiffs' Temurbek Hikmatullaev ("Hikmatullaev") and Asatilla Yakvalkhodjaev ("Yakvalkhodjaev") (collectively "Plaintiffs) Combined Application for Entry of an *Ex Parte* Temporary Restraining Order and for a Preliminary Injunction ("Motion for TRO"). [ECF No. 5]. The Motion for TRO was referred to me by the Honorable Roy K. Altman for a report and recommendation. [ECF No. 13]. For the reasons addressed below it is recommended that the Motion for TRO be **GRANTED in part and DENIED in part**.

**BACKGROUND**

The instant dispute revolves around Plaintiffs' attempt to purchase a rare $1,000,000 Richard Mille watch (the "Watch") as a gift. Hikmatullaev, a dual citizen of the United States and Uzbekistan, is the Chief Economic Officer ("CEO") of Global Concierge Services, LLC ("GCS"), "a company focused on obtaining rare items like the Watch, to locate a Watch for sale." [ECF Nos. 5 at 3; 5-1 at ¶¶ 2–3]. In May 2023, Hikmatullaev, working through GCS and its representative Reece Frederik ("Frederik"), contacted an individual named Dario Mazzanati ("Mazzanati") for

1

his assistance in obtaining the Watch. [ECF Nos. 5 at 3; 5-1 at ¶¶ 5–6]. Mazzanati had previously assisted GCS in obtaining items for its customers. [ECF Nos. 5 at 3; 5-1 at ¶ 6]. Mazzanati introduced Frederik to Marco Alessandro Villa ("Villa"), Alessio Mulasso ("Mulasso"), and Giorgio Mariani ("Mariani"), as well as the corporation Villa operated through, Lumech, Inc. ("Lumech") (collectively "Defendants"). [ECF Nos. 5 at 4; 5-1 at ¶ 7–11]. They met at Villa's home in Miami Beach, Florida, on May 13, 2023, to complete the transaction. [ECF Nos. 5 at 5; 5-1 at ¶ 19].

Defendants represented that they had the Watch for sale, and Villa sent a video to Hikmatullaev in which he displayed the Watch. [ECF Nos. 5 at 4 n.3; 5-1 at ¶ 12]. Ultimately, Villa agreed to sell Hikmatullaev the Watch for $1,000,000. [ECF Nos. 5 at 4; 5-1 at ¶ 13]. Hikmatullaev agreed, but informed Villa that "time was of the essence" because the Watch was to be given as a gift. [ECF Nos. 5 at 4; 5-1 at ¶¶ 13–14]. Following discussion, both parties agreed "that the most effective mode to conduct the transaction was through an equivalent exchange for cryptocurrency assets … [specifically] Tether's U.S. Dollar Token ("USDT"), a stablecoin that generally maintains a value equal to the U.S. Dollar." [ECF Nos. 5 at 4; 5-1 at ¶ 15].

Hikmatullaev, however, did not have an active cryptocurrency account. [ECF Nos. 5 at 4; 5-1 at ¶ 16]. As such, Hikmatullaev had Yakvalkhodjaev facilitate the transaction through his Binance account ("Yakvalkhodjaev's wallet"), although Hikmatullaev completely funded the transaction. [ECF Nos. 5 at 4; 5-1 at ¶¶ 16–18].

Hikmatullaev sent the $1,000,000 agreed upon purchase price in a series of transactions. On May 13, 2023, Hikmatullaev sent an initial test transaction of $86 USDT to (0xB7d58dF3C80C12948FC14aAa0cc4d1bE1DCD4163) ("Villa's Coinbase Wallet"), which Villa confirmed had been received. [ECF Nos. 5 at 5; 5-1 at ¶¶ 16–18]. The same day,

Hikmatullaev sent $100,000 USDT to Villa's Coinbase Wallet, which Villa again confirmed he had received. [ECF Nos. 5 at 5; 5-1 at ¶¶ 24–25]. Hikmatullaev sent the remaining $900,000 USDT the following day, after which Villa indicated he had the last transfer but that "Coinbase had flagged the transaction as suspicious and therefore would release the $900,000 USDT transfer after its review of the transaction." [ECF Nos. 5 at 6; 5-1 at ¶ 27].

Plaintiffs never received the Watch. Villa "issued a false invoice … [which] incorrectly states the amount Hikmatullaev sent to Villa, it d[id] acknowledge that Villa represented that he intended to sell Hikmatullaev the Watch." [ECF Nos. 5 at 6; 5-1 at ¶¶ 27–30]. Defendants informed Hikmatullaev that they wanted to cancel the transaction. [ECF Nos. 5 at 6; 5-1 at ¶ 36]. Villa returned $188,000 USDT to Hikmatullaev through Yakvalkhodjaev's wallet. [ECF Nos. 5 at 6; 5-1 at ¶ 36]. The remaining $812,086, however, was never returned, nor did Defendants tender the Watch. [ECF Nos. 5 at 6; 5-1 at ¶¶ 41–42]. Consequently, Plaintiffs initiated the instant lawsuit.

On June 23, 2023, Plaintiffs filed a seven count Complaint asserting claims for: (1) conversion; (2) breach of contract; (3) fraud; (4) civil conspiracy; (5) unjust enrichment; and (6) violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. [ECF No. 1]. Three days later Plaintiffs filed the instant Motion for TRO in which Plaintiffs seek: (1) entry of an Order directing Coinbase to freeze the Defendant Villa's Coinbase accounts, and any other account containing the Stolen Assets, and (2) entry of an Order restricting Defendants' international travel. *See generally* [ECF No. 5].

## **LEGAL STANDARD**

To obtain a Temporary Restraining Order, a party must demonstrate "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-

movant; and (4) that the entry of the relief would serve the public interest." *Schiavo ex. rel Schindler v. Schiavo,* 403 F.3d 1223, 1225–26 (11th Cir. 2005).

Additionally, Fed. R. Civ. P. Rule 65 provides that:

The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney if:

(A)  specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B)  the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). As part of their equitable powers, courts have the inherent authority to order prejudgment relief, including freezing assets, when necessary to preserve the availability of permanent relief. *See Levi Strauss & Co. v. Sunrise Int'l. Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995) (explaining that a "request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief").

*Ex parte* temporary restraining orders "should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer." *Granny Goose Foods, Inc. v. Bd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974).

## **DISCUSSION**

Plaintiffs have shown a strong likelihood of success on the merits in their claims against Defendants. Plaintiffs have proffered evidence demonstrating that they transferred $812,086 USDT to Defendants in exchange for the Watch. Plaintiffs have alleged that despite this payment

they never received the Watch or a refund for the $812,086 USDT Villa retained. These facts establish a *prima facie* case for conversion, breach of contract, and unjust enrichment.

Specifically, Plaintiffs have also demonstrated that they are likely to succeed on their fraud claim. Plaintiffs' Complaint sets forth specific statements and conduct by Defendants, that if true, would establish that Defendants intentionally made statements aimed at inducing Plaintiffs into believing that if they transferred the Stolen Assets, Defendants would tender the Watch to Plaintiffs.

Plaintiffs have further demonstrated that they will suffer irreparable harm if a TRO is not entered against Defendants. Specifically, Plaintiffs have shown there is a likely danger that if Defendants' assets are not frozen, the cryptocurrency assets Defendants fraudulently obtained and still retain may be absconded with or otherwise dissipated before Plaintiffs can obtain the relief sought in the Complaint. Courts have found that such a showing satisfies the irreparable harm prong because of "the speed with which cryptocurrency transactions are made as well as the anonymous nature of those transactions" freezing assets are necessary to "maintain the *status quo* to avoid dissipation of the money illegally taken" from a plaintiff. *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805315, at *3 (S.D. Fla. Apr. 22, 2022). That is the situation the Court is presented with here.

This Court finds that the balance of hardships favors Plaintiffs because a preliminary injunction will preserve the *status quo ante* and prevent Defendants from irreparably dissipating the Stolen Assets before this Court may conduct a trial on the merits of Plaintiffs' claims and enter final equitable relief. *See Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *4–5 (S.D. Fla. June 17, 2022) (concluding that the balance of equities does not favor the defendant

where the defendant would only be prohibited from selling, transferring, or encumbering the property while litigation moves forward).

Lastly, entering a TRO favors the public interest because it encourages compliance with the law and disincentivizes and punishes criminal behavior. *See Fla. Atl. Univ. Bd. of Trs. v. Parsont*, 465 F. Supp. 3d 1279, 1298 (S.D. Fla. 2020). Freezing the cryptocurrency accounts reassures the public that even with transactions conducted in the cryptocurrency space, there is an adequate remedy at law to prevent fraud or theft.

Having determined that a TRO is appropriate, the Court must address the exact relief Plaintiffs seek in the TRO. Not only do Plaintiffs request that Defendants' Coinbase accounts or any other account containing the stolen assets be frozen, they also request Defendants be required to turn over their passports to the Court and be prohibited from travelling internationally. Plaintiffs request to have the pertinent Coinbase accounts frozen to prevent dissipation of the assets in controversy here is logical, appropriate, and is a common remedy employed in similar cases. The same cannot be said for Plaintiffs' request that Defendants be required to turn over their passports.

In support for this request, Plaintiffs cite *Bank of Am., N.A. v. Veluchamy*, 643 F.3d 185 (7th Cir. 2011). In that case, the Seventh Circuit concluded that district courts have the "power to temporarily seize the passports of judgment-debtors who are subject to a production of assets order." *Id.* at 186. Even a cursory reading of this case would illuminate an important distinguishing fact from those presented here: the defendants in *Veluchamy* were judgment debtors and the defendants here are not. The *Veluchamy* court noted that a court's "injunction power reaches orders 'essential to prevent the dissipation of assets.'" *Id.* at 189 (quoting *SEC v. Lauer*, 52 F.3d 667, 671 (7th Cir. 1995). The court, however, also noted that

> Whether such controls are necessary will depend upon the circumstances of the case, but it will be a rare case where any extraordinary steps are needed. In the

lion's share of cases, the debtor will not have moved assets to a locale beyond the court's jurisdiction, and thus the court's other powers—especially its power to order the holding financial institution itself to freeze the assets—will be enough to safeguard the court's ability to enforce a production order.

*Id.* In that case, the Seventh Circuit noted that the district court's "bases for findings of necessity and flight risk were clear and largely uncontested … [because] [t]he district court was faced with debtors who had previously transferred abroad all of the funds now subject to the order and were simultaneously hesitant to disclose information that would have revealed those transfers." *Id.*

At this juncture, aside from Plaintiffs' allegations that Defendants have strong international ties, there is nothing to indicate they would flee this jurisdiction of this Court. While this Court understands Plaintiffs concerns in this respect, the Court's order directed to Coinbase to freeze the assets in Defendants accounts and any other accounts in which the funds have been transferred is the appropriate remedy to preserve the *status quo*. As such, Plaintiffs' request that Defendants be required to turn over their passports and be prohibited from travelling internationally is unwarranted.

The last issue to address is Plaintiffs' request that this Court not require them to post any bond. Rule 65(c) provides that a court issuing a preliminary injunction or TRO should do so "only if the movant give security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Yet, "[c]ourts retain extensive discretion to set the amount of a bond required as a condition for issuing a preliminary injunction and may, in fact, elect to require no bond at all." *Astrove v. Doe*, No. 22-CV-80614-RAR, 2022 WL 2805345, at *5 (S.D. Fla. June 17, 2022) (citing *BellSouth Telecom., Inc. v. MCI Metro Access Transmission Svcs.*, LLC, 425 F.3d 964, 971 (11th Cir. 2005)).

Here, Plaintiffs argue the Court should not impose a bond requirement because "Plaintiffs only seek to freeze the Stolen Assets and the accounts they may be in and not all of Defendants' assets." [ECF No. 5 at 18]. The Court agrees because Plaintiffs ask only to freeze the amount owed to them. Consequently, no bond is required.

## CONCLUSION

For the foregoing reasons it is **RECOMMENDED** that Plaintiffs' Motion for TRO be **GRANTED in part and DENIED in part**, and that a temporary restraining order be entered as follows:

1. Coinbase is directed to immediately freeze and restrict all transfers for any account belonging to MARCO ALESSANDRO VILLA, including but not limited to the wallet with the address 0xB7d58dF3C80C12948FC14aAa0cc4d1bE1DCD4163 until further order of this Court;

2. Coinbase is directed to restrict any accounts belonging to ALESSIO MULASSO GIORGIO MARIANI and/or LUMECH, INC., or any other account in which the Stolen Assets are Traced, until further order of this Court;

3. The amount of assets subject to the freeze in paragraphs of 1 and 2 shall not exceed $812,086 USDT.

4. Coinbase is ordered to produce account statements for May, June, and when issued, July 2023 related to Villa's Coinbase Wallet, showing all incoming and outgoing transfers in that account.

5. No Defendant who is in possession of any of the Stolen Assets may transfer any of said funds in possession of any cryptocurrency platform, financial institution, payment processor, bank, escrow service, money transmitter for any purpose without the express authorization of this Court.

6. Plaintiffs' counsel is ordered to send a copy of this Order, the Motion for TRO, and the Complaint to Defendants and Coinbase via email and by overnight mail, to the extent addresses they are able to find a last known address for each Defendant within seven (7) days of this Court's order. Plaintiffs are further ordered to serve the Complaint or a request for waiver consistent with the Federal Rules of Civil Procedure.

7. Any Defendant or Coinbase may petition the Court to modify the asset restraint set out in this Order.

8. If the District Judge adopts the recommendations made in the Report, a hearing will be set before this Court within fourteen days of the Order, at which time Defendants and/or any other affected persons may challenge the appropriateness of this Order and move to dissolve the same and at which time the Court will hear argument on Plaintiffs requested Preliminary Injunction.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Rule 4(a), Plaintiff has **THREE** (3) days from the date of this Report and Recommendation to serve and file written objections, if any, with the District Judge.[1] *See generally Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507 (11th Cir. 1990). Failure to timely file objections will bar a *de novo* determination by the district judge of anything in this Report and shall constitute a waiver of a party's "right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020); 28 U.S.C. § 636(b)(1)(C).

**SIGNED** this 28th day of June, 2023.

---

[1] Because this Report and Recommendation stems from an *ex parte* application, the Undersigned is shortening the normal objection period for Plaintiffs, and Defendants will not have the opportunity to object to the Undersigned's recommendations because of the *ex parte* nature of a temporary restraining order.

_[signature]_
LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc: **United States District Judge Roy K. Altman;**

**Counsel of Record**